## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cr. No. 19-246 (MCA) |
| | ) | |
| Creaghan Harry, | ) | |
| | ) | |
| Defendant. | ) | |

## THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO REVOKE THE U.S. MAGISTRATE JUDGE'S DETENTION ORDER

The United States of America, by its Attorneys, Rachael A. Honig, Attorney for the United States, by Jacob Foster, Assistant Chief, and Darren C. Halverson, Trial Attorney, respectfully requests that the Court deny defendant's motion to revoke United States Magistrate Judge Joseph A. Dickson's January 31, 2020 order that denied, without prejudice, defendant Creaghan Harry's amended bail application, after defendant's previously proposed bail package had "essentially fallen apart," and also denied the government's motion for reconsideration of the release order as moot.  Docket entry no. 97.  Defendant's motion misstates the relevant facts and law, and provides no basis for revisiting

Magistrate Judge Dickson's carefully-considered decisions regarding bond.

Indeed, to the extent that Judge Dickson's order is modified, defendant should simply be detained, as the government argued in its motion for reconsideration.  Defendant is an unrepentant conman who perpetrated one of the largest health care fraud offenses in United States history, for which he faces a Sentencing Guidelines range that amounts to life imprisonment.  The government's proffer established a two-decade long history of deceit and scheming that involved extensive foreign ties, foreign businesses, foreign residences, and foreign assets, including a nearly $1 million yacht that was moved from the jurisdiction of the United States to Mexico after the time of defendant's arrest.  Defendant lied about these foreign ties in this interview with Pre-Trial Services, and, through his previously retained attorneys, also made false statements to the Court in detention proceedings.  He previously assisted others in fleeing the country and told multiple cooperating witnesses that he would flee to foreign jurisdictions.  He cannot be trusted to abide by any conditions of release.

2

That defendant's previously proposed bail package has fallen apart does not entitle him to a lighter package.  While the initial bail package involved an amount of $2.5 million, secured by an appearance bond, co-signed by two financially responsible individuals, and secured by three properties, the defendant now seeks to be released on bail of $1 million, secured by a single co-signer, and placed under the supervision of either the mother of one of his children or a friend.

This Court should reject defendant's proposal as insufficient to mitigate the defendant's risk of flight created by the nature of the charges, weight of the evidence, the defendant's background, and his history of duplicity, along with the economic danger that the defendant poses to the community.

## Background

Defendant Creaghan Harry was born in Canada and retains his Canadian citizenship.  He has lived and operated businesses in Panama and the Dominican Republic.  The present indictment involves call centers controlled by Harry and operated in the country of Colombia.

### A.    The Indictment

The defendant was indicted by the grand jury on April 5, 2019, (along with coconspirators Lester Stockett and Elliott Loewenstern) with one count of conspiracy to defraud the United States and to pay and receive health care kickbacks, four counts of receiving health care kickbacks, and one count of conspiracy to commit money laundering.  Docket entry No. 1.  Stockett and Loewenstern subsequently pleaded guilty.

The indictment alleges that Harry is the mastermind of an international health care fraud scheme that resulted in the submission of over $424 million in fraudulent claims to Medicare. Harry, through his control of two purported telemedicine companies, paid doctors to write unnecessary orthotic brace orders

4

for Medicare beneficiaries and solicited illegal bribes for those

orders from brace suppliers (or international telemarketers acting

on behalf of the brace suppliers.  *Id.* at ¶¶ 1(g) & 9(a)-(e).

The Indictment alleges that Harry engaged in extensive efforts

to conceal and disguise the scheme, including by lying to his own

lawyers, including lawyers at the law firm of Brown and Fortunato,

P.C., in order to obtain legal opinion letters that Harry used as

lulling letters to attempt to defraud investors and induce others to

participate in the scheme.  *Id.* at ¶ 9(h).  Harry falsely represented

to lawyers, investors, and others that he operated bona fide

telemedicine companies that made money from subscription fees

paid by patients seeking telemedicine services, while concealing

that the vast majority of the payments for the consultations were

actually kickbacks paid by brace suppliers.  *Id.* at ¶ 9(h).

The Indictment alleges that, as part of a conspiracy to commit

money laundering, Harry also attempted to conceal and disguise

the payment and receipt of the illegal kickbacks and bribes by

having brace suppliers pay nominee companies, placed in the

names of nominee third parties, and engaging in byzantine financial

transactions both in the United States and abroad. *Id.* at ¶ 9(i).

The purpose of these financial transactions was to attempt to make

it appear that the telemedicine companies were not receiving money

from brace suppliers or marketers, when in reality they were

receiving such kickbacks (just indirectly, instead of directly).

### B.   Harry's False Statements to Pre-Trial Services

Upon his arrest, Harry was briefly interviewed by Pre-Trial

Services in the Southern District of Florida.  In the interview, Harry

made the following statements that are material to the Court's bond

determination:

- Harry disclosed four or five foreign trips in the last ten

years.  In fact, Harry's taken at least 57 international trips in the

past ten years.

- Harry stated that his international travel included

"maybe Panama."  In fact, Harry took at least 25 international trips

to Panama in the past ten years.

- Harry stated that he had lived in "Canada for six months,

[and has] been in the United States since."  In fact, Harry previously

lived in the Dominican Republic and Panama.

## C.    The Detention Hearings

### 1.    Southern District of Florida

Upon his initial appearance on April 9, 2019, Harry, represented by counsel, knowingly and voluntarily waived his right to a detention hearing in the arresting district and was ordered transferred to the District of New Jersey.  Docket Entry No. 13.[1]

### 2.    The May 30, 2019 Hearing Before Judge Dickson

Upon his initial appearance in the District of New Jersey, Harry, now represented by a third set of attorneys, sought review of his bail conditions.  *See* Docket Entry No. 14.  At the hearing, the government proffered witness statements, financial records, email communications, and submitted other documents to the Court. *U.S. v. Harry*, Transcript of Bail Hearing dated May 30, 2019 (May 30 Tr.), Ex. A.

-------------------

[1] Harry subsequently retained a second set of attorneys, who sought a detention hearing in the Southern District of Florida.  Although the government indicated it would appear at a hearing to oppose the motion, the court found that it had been divested of jurisdiction by Harry's prior election of a detention hearing in the District of New Jersey.  *United States v. Harry*, 9:19-mj-08129-BER (S.D.F.L. 2019) (Docket entry no. 3.)

In regard to the history and characteristics of the defendant, the government proffered evidence that Harry was engaged in complex computer-based fraud schemes for nearly two decades. *Id.* at 13-15. For example in January 2005, the defendant entered into a consent judgment with the Federal Trade Commission (FTC) after the filing of an administrative complaint alleging that defendant was engaged in the deceptive online marketing and sales of human growth hormone. *See* Ex. B. Specifically, the FTC alleged that defendant took great strides to conceal his identity when marketing his products, including by conducting transactions were under the name of a fictitious individual, locating businesses in Canada, Sweden and Switzerland, registering websites in China, and transferring the proceeds from the sale of the products to bank accounts in Latvia. *See id* at ¶¶ 11-21.

The government also proffered statements from multiple witnesses that in response to the FTC action, Harry continued various international fraud schemes, but sought to disguise his involvement by placing companies in the name of nominee owners. Ex. A (May 30 Tr. at 15-16). For example, in regard to the indicted

offense, the government introduced financial records that Harry sought to conceal and disguise the scheme by having kickbacks paid through shell companies such as Latin American Call Centers and PCS CC, LLC.  Exs. C and D.  The government also submitted email communications between Harry and subordinates regarding payments made to the nominee owners of these companies.  Ex. E.

In regard to the weight of the evidence, the government submitted email and other communications authored by the defendant in which he represented to lawyers, doctors and investors that he was running profitable and legitimate telemedicine companies that did not receive any money, directly or indirectly, from brace suppliers or marketers.  Exs. F-J.  The government proffered multiple witness statements, undercover recordings, and financial records that defendant knew these representations were false because nearly all of the funds received by the telemedicine companies were bribes from brace suppliers and marketers.  Ex. A (May 30 Tr. at 8:5-14.)

In regard to the risk of flight, the government submitted email communications where defendant discussed bank accounts that he

possessed in Cyprus.  Ex. L.  The government also proffered financial records regarding bank accounts established by the defendant in the Dominican Republic, statements by a cooperating witness that Defendant stated that he sought to establish a bank account in Belize as a "rainy day fund", and indicated that its investigation had not been able to account for all of the millions of dollars in funds involved in the massive scheme.

In response to allegations that defendant lied to and manipulated the attorneys at the law firm Brown & Fortunato into producing an opinion letter he then used to conceal his crimes, the defendant, through counsel, lied to the Court about ever having had communications with the anyone at the firm.  When Magistrate Judge Dickson asked if the defendant had communicated with Brown & Fortunato, his counsel took time to confer with defendant, speaking with him off the record, before (falsely) representing to the Court that Harry "never had any conversations with [Brown & Fortunato]" and that "Stockett was somebody who dealt with Brown and Fortunato, not my client."  May 30 Tr. at 35:3-17.

At the conclusion of the hearing, Magistrate Judge Dickson noted that the defendant's "package that [he] proposed" was "a little light." *Id.* at 50:1-2.  The defendant stated that he would attempt to increase the offer of bond for the defendant.  *Id.* at 51:13 - 51:9. The Court granted the government's motion for detention of the defendant without prejudice, and reserved on the defendant's motion for pretrial release while awaiting the modified bond proposal.  *Id.* at 53:2-5.

### 3.   The August 5, 2019 Hearing Before Judge Dickson

During another detention hearing held on August 5, 2019, the defendant's counsel noted that new counsel had been retained by the defendant, and he became aware of it only days earlier.  *U.S. v. Harry*, Transcript of Bail Hearing dated August 5, 2019 (August 5 Tr.), Ex. M, at 4:18-21.  The defendant proposed a new bail package of $2.5 million secured by three residential properties with approximately $1.4 million in equity.  *Id.* at 5:18-22.  The government objected to this bail package as insufficient to reasonably assure the defendants appearance in court of the safety of the community.  *Id.* at 14:1-7.  The government further objected

to the collateral in the package because the relationships of the owners to the defendant meant that they lacked "moral suasion" over the defendant.  Docket entry no. 32.  The Court noted that it would reserve decision.

Magistrate Judge Dickson issued an opinion setting conditions for Harry's release dated November 15, 2019.  Docket entry no. 85. In setting conditions, the Court found "a high risk of flight" that "weigh[s] against release."  The Court further found that the defendant's release posed a danger to the community due to the nature of his alleged crimes, but that the danger could be mitigated by home confinement and removal of internet access.

Following entry of the release order, both the government and the defendant moved for reconsideration of the order.  In addition, two of Harry's sureties withdrew from his bail package, and one of the sureties also withdrew a substantial portion of the collateral from the package which was the home of Harry's former partner and mother of his three children.  A second property securing the bond in an estimated amount of $924,000 was also found to be no longer suitable for inclusion in the bail package.  Magistrate Judge

12

Dickson entered a second order on January 31, 2020, vacating the initial release order and finding that "Harry's release would involve a high risk of flight and some potential danger to the community" and also that the removal of sureties and collateral from the bail package meant that the package would be "insufficient to reasonably guarantee [Harry's] appearance at trial."  Docket entry no. 97 at 4.  The Court further noted that "Harry owns a yacht, worth approximately $1,000,000, which a friend has taken to Mexico, where it is generating revenue for Mr. Harry as a charter vessel," which is "a significant source of funds abroad" and a "physical means of absconding."  *Id.* at 4.  Magistrate Judge Dickson concluded that "there is no longer any set of conditions of release—which Harry can satisfy—that will reasonably guarantee his appearance at trial."  *Id.* at 5.

## Discussion

The Government respectfully submits that there are no appropriate bail conditions because defendant presents a significant flight risk and danger to the community.

## I.     Applicable Law

Magistrate Judge Dickson's order setting the conditions of release is subject to *de novo* review by this Court.  *See United States v. Delker*, 757 F.2d 1390, 1395 (3d Cir. 1985).

The question of bail is governed by the factors set forth in the Bail Reform Act.  Those factors include: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the person, including, among other things, the defendant's ties to the community, past conduct, and financial resources; and (4) whether the defendant poses a danger to the community if released.  18 U.S.C. § 3142(g)(1)-(4).  If, after weighing these factors, the Court concludes that "no condition or combination of conditions will reasonably assure the appearance of the person as required . . . . " then bail should be denied.  18 U.S.C. § 3142(e).

"It is well settled that at a detention hearing the government may proceed by proffer [and] that hearsay testimony may be used . . . . " *United States v. Muse*, No. 14-2007 JS, 2014 WL 495121, at *1 (D.N.J. Feb. 6, 2014).  Courts regularly accept

14

government proffers of evidence and electronic communications to demonstrate the weight of evidence against a defendant for purposes of detention. *See, e.g., United States v. Boustani*, 356 F. Supp. 3d 246, 253 (E.D.N.Y. 2019), *aff'd*, No. 19-344, 2019 WL 2070656 (2d Cir. Mar. 7, 2019).

While pretrial detention implicates a liberty interest and thus may not be imposed contrary to the mandates of procedural due process, such due process "is flexible and calls for such procedural protection as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972).

## II.   Bail Should be Denied

### A   Nature and Circumstances of the Offense

Defendant's brief attempts to minimize the nature and circumstances of the charged offense, arguing that Magistrate Judge Dickson made "conclusory findings" that Harry "faces a '*de facto* life sentence.'" Deft. Mot. at 7-8 (quoting docket entry no. 97 at 6). But there is no realistic dispute that Harry faces a Guidelines Sentencing range that, at his age, amounts to life imprisonment and a statutory maximum of 50 years. The defense refers to the

15

length of this sentence as "unremarkable circumstances," Mot. at 8, but the potential penalty alone distinguishes this case from the run-of-the-mill health care fraud cases cited by the defense where bail was granted.

Defendant is incorrect in asserting that the "magistrate judge's overwhelming reliance on charges and penalties was thus in error," Mot. at 8, because numerous courts have recognized that the seriousness of the charges and the severity of the penalties gives the defendant an incentive to flee. *United States v. Cisneros*, 328 F.3d 610, 618 (10th Cir. 2003) (defendant was a flight risk because her knowledge of the seriousness of the charges against her gave her a strong incentive to abscond); *United States v. Townsend*, 897 F.2d 989, 995 (9th Cir. 1990) ("Facing the much graver penalties possible under the present indictment, the defendants have an even greater incentive to consider flight."). Even in the absence of means and foreign ties—which, as discussed in detail below, the defendant has in abundance—the fact of a *de facto* life sentence alone would provide a compelling incentive for anyone to fail to appear.

16

Defendant attempts to diminish the seriousness of the charged offenses by asserting that "[t]his matter does not involve any danger to any human being; in fact, it does not even involve danger to anyone's property," Deft. Mot. at 8, but the offense in fact involves theft of money entrusted for the elderly and disabled.  Indeed, health care fraud alone is a serious crime that Congress has long condemned as contrary to the public interest and a threat to the viability of Medicare.[2]  And this Circuit has noted the pernicious impact that illegal kickbacks have on the health care system. *United States v. Goldman*, 607 F. App'x 171, 174 (3d Cir. 2015) (rejecting argument that the Anti-Kickback Statute was "technical,"

---

[2] H.R. 95-393, pt. II, at 44 (1977) ("In whatever form it is found, . . . fraud in these health care financing programs adversely affects all Americans.  It cheats taxpayers who must ultimately bear the financial burden of misuse of funds in any government-sponsored program.  It diverts from those most in need, the nation's elderly and poor, scarce program dollars that were intended to provide vitally needed quality health services."; H.R. Rep. 104-747 (1996) ("Everyone pays the price for health care fraud: beneficiaries of Government health care insurance such as Medicare and Medicaid pay more for medical services and equipment; consumers of private health insurance pay higher premiums; and taxpayers pay more to cover health care expenditures.").

noting that "[d]octors are supposed to make decisions based on medical necessity, not their own fiscal interests.").

Notwithstanding the defendant's dismissive remarks, the consequences of conspiring to defraud the United States are real and serious. Recognizing the importance of such harm, when a defendant has been charged with health care fraud offenses, courts have ordered detention. *See United States v. Fata*, 2013 U.S. Dist. LEXIS 149168, *5-6 (E.D. Mich. 2013); *United States v. Akamnonu*, 2012 U.S. Dist. LEXIS 59084, *5-6 (N.D. Tex. 2012 April 27, 2012) (nature and circumstances of health care fraud charges supported detention); *United States v. Fallah*, 2007 U.S. Dist. LEXIS 75320, *2-3 (S.D. Tex. Oct. 10, 2007) (same).

Defendant also argues that pretrial detention for an Anti-Kickback offense is "perhaps unprecedented" in the District of New Jersey and compares this case to a series of other health care fraud and kickback cases charged in this district over the last several years. Deft. Mot. at 8. But this is a strawman argument because Magistrate Judge Dickson did not order pretrial detention, as the government urged; instead, he found that it was unnecessary to

18

consider the government's motion for reconsideration of his order setting conditions of release because Harry was no longer able to satisfy the originally proposed bail package of conditions.

Further, review of the cases cited by defendant demonstrates that these more standard cases are factually inapposite because they don't involve involving an international conspiracy with a $424 million loss.  They also are legally distinguishable because the government *did not seek detention* for the defendants.

Defendant discusses at length the recent bail order by Magistrate Judge Dickson in *United States v. Williamsky*, but this order actually supports denial of Harry's motion for release here.  In Williamsky, involving a defendant who played a smaller role in a similar kickback scheme with a loss of approximately $150 million—the Court entered a release order for a secured bond in the amount of $3 million, which is three times what the defendant here has proposed despite his significantly greater loss and role in masterminding the scheme.  Similar to Harry, who was not able to satisfy the $2.5 million secured bond that was originally set forth by

Magistrate Judge Dickson, Williamsky was not able to satisfy the conditions of release and remains detained.[3]

## B.     Weight of the Evidence against the Defendant

The possibility of a lengthy period of incarceration is certainly sufficient to motivate the defendant to flee.  That incentive, however, is only increased in light of the strength of the evidence against the Defendant – and thus the likelihood of his conviction. Here, the case against the Defendant is overwhelming.  The case is based on numerous cooperating witnesses, consensually recorded conversations, electronic communications, bank and financial records, Medicare records, and other documents and witnesses.

The strength of the evidence is reflected by the fact that Harry's two co-defendants – the CEO (Lester Stockett) and Vice President of Marketing (Elliot Loewenstern) of Harry's telemedicine companies – quickly pled guilty and agreed to plea agreements with

---

[3] Furthermore, with respect to *United States v. Chong* and *United States v. Rehfuss*, who were each granted bail, a third defendant in that matter remains at large in Cuba despite an Interpol Red Notice requesting his worldwide arrest.  Thus, in some health care fraud cases in this district, particularly those like the instant case, detention is necessary to prevent the risk of flight.

Sentencing Guidelines ranges of 188 to 235 and 135 to 168 respectively.

Defendant asserts that the evidence is largely "circumstantial", Deft. Mot. at 14, but that assertion is incorrect. The information provided by the codefendants is detailed, credible, and corroborated, in many instances, by other witnesses and contemporaneous documents, records and other evidence, including electronic recordings, email communications, and text messages that were written by the defendant himself or directly involve him. A recording of the defendant himself on a Skype call documents the defendant offering doctor's order in exchange for payments, with the amount of the payments based on the number of patient referrals received from an international patient recruiter. Put simply, all of this evidence weighs heavily in favor of detention.[4]

---

[4] Defendant also asserts that the defense has "not had meaningful access to discovery," but this assertion is false. The government provided extensive discovery including terabytes of email communications, a server containing beneficiary medical information, bank records, Medicare records, reports of interviews and other investigative activity, consensually recorded conversations. The defendant has informed the government that he

**C.   History and Characteristics of Defendant**

Defendants' history and characteristics also strongly support detention.  Defendant's motion badly misrepresents the record in asserting that Harry has "*no foreign connections or assets*," Mot. at 18 (emphasis added), when even Harry's own publicly available Facebook page touts that Harry "opened up a [call] center in San Jose [Costa Rica] for his own business, and it grew to 9 centers across the globe."  Ex. M.

**1.   History of International Fraud**.  From in or around 2000 to in or around 2005, Defendant was the mastermind of a scheme involving the "deceptive marketing and sale of bogus [HGH]" through a "deluge of illegal junk mail."  Ex. O at 1.  As the FTC alleged, "Defendant has taken great strides to cloak the responsibility for his illegal practices, utilizing different names,

---

is disinclined to review all of these materials due to the costs associated with maintaining them in electronic format, and he has requested that the government provide materials in smaller volumes, which the government has worked diligently to accommodate this request.  That, however, does not mean in any way that the government did not satisfy its discovery obligations in its initial production.

foreign addresses, anonymous Web sites and spam, and an overseas bank account." *Id.* at 2.

In or around 2004 to 2006, defendant also was involved in an illegal conspiracy to distribute controlled substances *via* the internet from call centers controlled by defendant in the Dominican Republic.  According to Cooperating Witness-1, after a search warrant was executed on defendant's American business partner, Christopher Smith, Harry assisted Smith in fleeing to Harry's residence in the Dominican Republic, assisted Smith in reconstituting the online pharmacy in the Dominican Republic, advised Smith on illegally moving $100,000 from the United States to the Dominican Republic using a hawala underground banking network, showed Smith a website that "advised people on which countries they could flee to without facing extradition," assisted Smith's later flight to Turks and Caicos, and advised Smith to open foreign bank accounts in the names of third parties, as Harry stated he had done in Switzerland and Sweden.  *See* Ex. P.  Smith ultimately was apprehended and sentenced to 20-years imprisonment in Criminal Case No. 05-282 (D. Minn. 2005).

23

After 2006 until the time of his arrest, defendant continued to be involved with operating international call centers in Colombia and Panama.  Prior to 2015, the beginning of the time period of the instant indictment, defendant was involved in a scheme to solicit illegal kickbacks and bribes in exchange for the referral of patients for medically unnecessary compounded medications.  Ex. Q.

    **2.**    **History of Foreign Ties**.  Defendant retains his Canadian citizenship, previously resided in the Dominican Republic and Panama, operates businesses throughout Central and South America, and is a frequent international traveler.  There can be no assurance that, upon release, the defendant would suddenly lack access to such means of travel.  And there can be little doubt that the defendant is in a position to abandon millions of dollars in cash and property securing any potential bond and still live comfortably for the rest of his life by operating computer-based fraud schemes from foreign countries.

    **3.**    **Foreign Assets**.  The government has obtained evidence that defendant controlled, or claimed to others to control, foreign bank accounts in the Dominican Republic, Panama Cyprus,

Colombia, Sweden, Switzerland.  *See* Ex. Q; Ex. R.  Harry told

Cooperating Witness-2 that he wanted to open up bank accounts in

"Belize to serve as a 'rainy day' fund and as a way to further hide

the movement of money."  Ex. Q at 8.  It is undisputed that the

defendant also owns a nearly $1 million yacht that currently is in

Mexico.  These resources make the risk of flight exceedingly high.

    **4.**   **Nominee Assets**.  Defendant has a demonstrated

practice of transferring money to bank accounts held in the names

of nominees.  For example, defendant invested money into a life

insurance account held by his ex-wife and told a cooperating

witness that he "set it up that way because the money would be

protected from the government."  Ex. Q at 14.

    **5.**   **Statements Regarding Flight**.  Harry's experience

assisting the flight of Christopher Smith, and comments about

Smith's flight, leads Cooperating Witness-1 to conclude that  "of

course [Harry] is going to run" if released.  Ex. Q at 7-8.  Harry also

told Cooperating Witness-2 that if Harry "had the money and the

government began investigating him he would flee to Venezuela."

Ex. Q at 15.

### 7.   **False Statements to Pre-Trial Services and the Court**.

In determining whether defendant can be trusted to abide by any

conditions of release, of central importance is the defendant's

repeated lies: as alleged in the Indictment; to Pre-Trial Services

about the extent of his international travel, where he traveled, and

his prior residences in the Dominican Republic and Panama; and to

the Court, in representing through counsel that he "never had any

conversations with [Brown & Fortunato]," a law firm with which the

defendant had "many communications" according to Brown &

Fortunato.  May 30 Tr. at 30:4-7; Ex. S.  Defendant declined to

correct this false representation despite multiple opportunities

offered on direct questioning by Magistrate Judge Dickson.  *See*

May 30 Tr. at 35:3-23; *U.S. v. Harry*, Transcript of Bail Hearing

dated July 11, 2019, Ex. T at 48:11 – 49:19.  The government has

demonstrated that these statements by defendant, through counsel,

were deceptive by obtaining and providing a privilege log produced

by Brown & Fortunato showing definitely that defendant exchanged

approximately 120 email communications with Brown & Fortunato

employees, of which he was the author of approximately 24 email

communications, including the very first email in the sequence of communications with the law firm with subject line "Initial discussion." Ex. U. This demonstrated contempt for the authority of the Court is alone a reason not to trust defendant to comply with conditions of release. *See U.S. v. Poulsen*, 521 F. Supp. 2d 699 (S.D. Ohio 2007) (noting contempt for judicial authority demonstrated through false statements provided a reason to believe defendant could not be trusted to comply with conditions of release).

Defendant similarly exhibit a lack of candor in regard to the location of the nearly $1 million yacht that was relocated to Mexico. The government obtained seizure warrants on or about September 12, 2019, provided these warrants to the defendant's attorney on September 18, 2019, and asked him to turn them over the United States. The government later argued that defendant should not be released because he "has not turned over the assets," *see* docket entry no. 61 at 2 & n.1, and made a similar argument before this Court as to why the seizure warrants should not be unsealed. *See* docket entry no. 73 at 1-2. In reply, defendant argued that the

27

government allegation was "patently false" and made "recklessly"
because defendant was purportedly "cooperating" to turn over the
yacht and awaiting a contact at the Marshals Service to turn the
assets over to.  *See* docket entry no. 79 at 3.  However, after the
government requested on November 21 that the defendant arrange
the turnover of the "yacht within 24 hours" to specified individuals
at the Marshals Service, it was only on November 25 that defense
counsel disclosed that he was having "difficulty identifying a point
of contact for the custodian of the boat" and listed the contact
number of a criminal defense attorney as the "contact" for the
"vessel."  It was only as a result of the government's subsequent
conversations with this criminal defense attorney that it became
clear that the yacht had been relocated from the United States to
Mexico, a fact that never was disclosed to Magistrate Judge Dickson
prior to the issuance of his release order.  *See* docket entry no. 82.

### D.   Nature and Seriousness of Defendant's Danger to the Community

The Bail Reform Act directs the Court to consider also "the
nature and seriousness of the danger to any person or the
community that would be posed by the person's release."  18 U.S.C.

§ 3142(g)(4).  As courts have recognized, the term "danger," as used in the Bail Reform Act of 1984, encompasses both physical and economic harm.  *Giampa*, 904 F. Supp. at 358; *see also Provenzano*, 605 F.2d at 95.

Here, Magistrate Judge Dickson correctly found that "given the nature of Defendant's alleged criminal activity, he would have the opportunity to engage in similar activity post-release."  *See* Docket entry no. 85 (Release Order) at 7.  Defendant took extraordinary measures to conceal the fraudulent scheme.  In order to avoid detection, Defendant created sham entities in foreign jurisdictions.

Defendant asserts that "there is no evidence on the record here of recidivist behavior," Deft. Mot. at 15, but the government proffered a nearly two-decade history of recidivist fraud, concealment, and attempts to avoid detection by the government. *See United States v. Burke*, 2013 U.S. Dist. LEXIS 134427, *2-3 (S.D. Fla. Sept. 17, 2013) (finding that where a defendant engaged in "methodical and repetitive efforts to defraud and evade detection," this "pattern of deception suggests that [he] would

29

continue to pose a danger of further harm to the community if released").

Indeed, defendant cites *United States v. Akinola*, No. 11-310 (JLL), 2016 WL 4508230, at *4 (D.N.J. Aug. 29, 2016) for the proposition that "the falsification of documents as a reason for finding of serious risk of flight, because it was 'the kind of action that can be done within the confines of a custodian's home.'" Mot. at 15. This supports detention based on the facts here because the Indictment alleges that defendant "falsified, fabricated, and altered . . . DME orders and other records," *see* Indictment ¶ 9(k), and the government's factual proffer demonstrate that defendant routinely falsified contracts, invoices, bank records, and other documents.

Based on the defendant's history of fraud and deceit discussed herein, and the instant charged crimes, Magistrate Judge Dickson correctly found that the defendant poses a significant risk of continuing economic danger to the community. Defendant's detention is necessary to ensure that he does not continue to endanger vulnerable Medicare beneficiaries in order to continue to

steal millions more from Medicare, or engage in other types of fraud schemes.

### III.  __Defendant's Proposed Bail Package is Insufficient__

His initial bail package having "evaporated," Defendant now seeks release based on a significantly reduced bail package.  The Court should reject this attempt.

First, defendant's proposal does not include home detention, even though defendant previously represented to Magistrate Judge Dickson that he would consent to the most restrictive conditions of release possible; specifically defense counsel noted, "[p]oint is that he'll subject himself to the most restrictive of conditions . . . . "  May 30 Tr. at 29:14-16.[5]

---

[5] To be clear, the government does not believe that electronic monitoring is sufficient for the defendant to be released, but it is certainly a necessary condition if the court elects not to detain him. *See United States v. Abdullahu*, 488 F. Supp. 2d 433, 444 (D.N.J. 2007) (noting that home detention with electronic monitoring impedes flight but does not guarantee appearance) (citing *United States v. Orena*, 986 F.2d 628, 632-33 (2d Cir.1993); *United States v. Gotti*, 776 F. Supp. 666, 672-73 (E.D.N.Y.1991)); *United States v. Vargas*, No. 13-2044 JS, 2013 WL 3223419, at *5 (D.N.J. June 25, 2013) (same); *see also United States v. Mercedes*, 254 F.3d 433, 437 (2d Cir. 2001) (noting that electronic monitoring, home detention,

Second, Magistrate Judge Dickson viewed an internet prohibition as a necessary measure to protect the public and prevent the defendant's flight.  Defendant now seeks release without a prohibition on his internet use.  As noted above, the defendant has been known as a "notorious spammer," and more importantly, the instant offense was conducted largely through internet and other international communications technologies.  For both the protection of the public and to prevent the defendant's flight, his internet use should be prohibited.

Third, while defendant previously proposed that he be released to including his former romantic partner Shawn Maley and his brother, the defendant now proposes that he be released to a second former romantic partner who is a subject of the government's money laundering investigation: Lena Jarborg—the mother of the defendant's eldest child—has received over $131,000 in tainted money from the defendant.  This Court should reject a

and assurances from family members that the defendant will comply with pretrial release are insufficient in the face of evidence that defendant is a flight risk).

32

custodian who has a close familial relationship with the defendant and received tainted funds from the defendant.  Numerous courts similarly have rejected proposals that family members serve as "third-party" custodians.  *See United States v. Vega Sosa*, 2011 U.S. Dist. LEXIS 18392, *4 n.5 (D.P.R. Feb. 24, 2011) (rejecting defendant's wife as custodian because she is "not a third party and is not a person that should be authorized nor can provide the defendant the necessary custodial discipline as a neutral third party."); *United States v. Cachucha*, 778 F. Supp. 2d 1172, 1179 (D.N.M. April 18, 2011) (rejecting fiancée).

### IV.    Due Process Does Not Require Defendant's Release

The defendant also argues that due process concerns necessitate his pretrial release regardless of his risk of flight or danger to the community.  Defendant fails to articulate or analyze the relevant factors under Third Circuit law that demonstrate that his continued detention complies with his constitutional due process guarantees.  Under *United States v. Accetturo*, the Circuit held that while a defendant's lengthy pretrial confinement might theoretically become unconstitutionally punitive, those interests

33

should analyzed under a two-part test.  783 F.2d 382, 388 (3d Cir. 1986).  The first part contemplates the bail factors under 18 U.S.C. § 3142(g)(1)-(4), including "the seriousness of the charges, the strength of the government's proof that defendant poses a risk of flight or a danger to the community, and the strength of the government's case on the merits," which the government has shown in this brief counsel for the defendant's continued detention in this case.  *See id.*  Second, the Court considered whether additional factors, including "the length of the detention that has in fact occurred, the complexity of the case, and whether the strategy of one side or the other has added needlessly to that complexity."  *Id.* The complexity of the case weighs in favor of the appropriateness of lengthy pretrial detention.  *See, e.g., United States v. Hodge*, No. CR 2016-0009, 2018 WL 1123866, at *8 (D.V.I. Feb. 23, 2018) (29-month appropriate in part due to complexity of the 12-defendant drug conspiracy case).  The Circuit also noted that because issues relevant to this consideration become clear closer to trial so "due process protections for detainees awaiting distant trials is thus better met farther down the procedural road."  *Id.*

34

Courts have routinely found that detention of a year or more met procedure due process standards where the delay was not a strategy of the government but was due in part to the defendant. *See United States v. Telfair*, No. CRIM A 08CR0757(DMC), 2008 WL 5188846, at *4 (D.N.J. Dec. 10, 2008) (holding 22-month detention constitutionally appropriate where "most of the delays in this case are due to the inherent complexities accompanying the significant number of motions and changes of counsel that have been made by Defendant."); *United States v. Zannino*, 798 F.2d 544, 548 (1st Cir.1986) (holding 16-month detention appropriate where defendant himself responsible for delay in trial); *United States v. Bianchi*, No. CRIM. 06-19, 2006 WL 2338285, at *2 (E.D. Pa. Aug. 10, 2006) (denying motion for pretrial release on due process grounds because "much of the unusual length of pretrial detention is attributable to Defendant himself and not to any strategy of delay by the Government"); *United States v. Lloyd*, No. CRIM. 13-252-17, 2015 WL 6823754, at *1 (W.D. Pa. Nov. 6, 2015) (No due process violation where defendant requested "continuance or otherwise caused the delay of trial in this matter for eighteen of the twenty

35

months of his incarceration."); *United States v. Thompson*, No. 4:16-CR-0019-19, 2018 WL 2341713, at *1 (M.D. Pa. May 23, 2018) (twenty-eight months in pre-trial detention not punitive because "trial has now been set in the not too distant future.").

Here, the defendant has been held from April 9, 2019 to the present—approximately eleven months—which is well within the time courts have found to be reasonable.  As discussed above, the bail factors weigh heavily in favor of the defendant's detention.  Perhaps more importantly, the delay in proceedings is occasioned by the defendant himself.  Most instructively, the defendant himself has, to date, not requested a trial date in this matter.  At the conference the Court held on January 28, 2020, the defendant explicitly declined to request a trial date, citing that he was having trouble reviewing the extensive discovery the government provided.  The defendant consented to a continuance through April 1, 2020.  Docket entry no. 96.  Moreover, the proceedings regarding bail have been occasioned by significant delay by the defendant.  First, the defendant consented to waive a detention hearing in the Southern District of Florida.  Later, following the May 30, 2019 hearing, his

counsel instructed the Court that he required additional time to propose a bail package sufficient to reasonably assure the Court of his appearance. *See May 30 Tr.* at 51:13 - 51:9.  Later, the additional delay was caused when the Court observed after issuing a release order on conditions that the defendant's bail package had "essentially fallen apart."  Docket entry no. 97.  Though some of these delays may be said to have been caused by the complexity of the charged case, none of them were occasioned by a strategy pursued by the government.  Although defendant cites to delays between hearings, he fails to recite that these delays were occasioned, in part, by his requesting time to propose and additional bail package, and then that proposed package falling apart.

Defendant fails to analyze these factors because they demonstrate that his detention is appropriate.  Importantly, even in the cases he cites where defendants were released in, in part, due to due process considerations, the Courts found weakness in the bail factor analysis.  For instance, in *United States v. Lopez*, the court found the government's arguments regarding risk of flight to

unpersuasive.  827 F. Supp. 1107, 1111–12 (D.N.J. 1993).

Moreover, the court found that much of the delay was caused by

the government provided approximately 3800 hours of audio tapes

to the defense without an index, including audio of twenty other

defendants in the case.  *Id.*  Here the government has provided the

defense with extensive logs of the discovery materials provided.  In

*United States v. Gatto*, also cited by the defendant, the court found

significant issues in the government's evidence.  750 F. Supp. 664,

674 (D.N.J. 1990)  Perhaps more importantly, the defendants in

Gatto offered to be released under stringent conditions including

"house arrest with electronic surveillance and a wiretap" on the

telephone.  *Id.* at 675.  For these reasons, these cases are

distinguishable and the defendant's due process claim without

merit.

## **<u>Conclusion</u>**

For the foregoing reasons, and to prevent flight and protect the public, the defendant should remain detained.  Accordingly, the United States respectfully requests that the Court deny the defendant's motion to revoke the detention order.

Respectfully submitted,

RACHAEL A. HONIG
Attorney for United States,
Acting Under Authority Conferred
By 28 U.S.C. § 515


By:   */s/ Jacob Foster*
JACOB FOSTER
Assistant Chief

DARREN C. HALVERSON
Trial Attorney

U.S. Department of Justice
Criminal Division, Fraud Section
970 Broad Street, Suite 700
Newark, New Jersey 07102

Dated: March 17, 2020